## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**GLORIA HUNTER and**
**JESSICA HUNTER,**

        **Plaintiffs,**

        **v.**                              **Case No.  06-2056-JWL**

**THE BUCKLE, INC. et al.,**

        **Defendants.**

_____

## MEMORANDUM AND ORDER

This lawsuit arises from an attempted forgery by a non-party to this lawsuit, Kyone Allen, that occurred at Town Center Plaza shopping center in Leawood, Kansas, on February 20, 2005.  Plaintiffs Gloria Hunter and Jessica Hunter, both of whom are African American, became involved in the incident which culminated with them being placed in handcuffs and removed from a retail store, after which they were released.  The defendants are retailer The Buckle, Inc., mall security IPC International Corp., mall owner and manager Town Center Plaza, LLC and Developers Diversified Realty Corporation, and the City of Leawood based on the actions of its police officers.  Plaintiffs assert claims pursuant to 42 U.S.C. §§ 1981 and 1983, as well as state law claims of false imprisonment, defamation, and false light publicity.

This matter is currently before the court on defendants' motions for summary judgment (docs. #112, 135, 137, 138 & 139).  For the reasons explained below, defendants

motions are granted in part and denied in part.  Specifically, summary judgment is granted on plaintiffs' claim under the contracts clause of § 1981, their § 1983 claim against the City based on a violation of § 1981, and their defamation and false light claims.  The motions are denied with respect to plaintiffs' claim under the full and equal benefits clause of § 1981, their § 1983 claim against the City based on an unreasonable seizure in violation of the Fourth Amendment, and their false imprisonment claim.

## STATEMENT OF MATERIAL FACTS[1]

Defendant The Buckle, Inc. (The Buckle) operates a retail apparel store in Town Center Plaza, an outdoor mall in Leawood, Kansas.  The mall is owned and managed by defendants Town Center Plaza LLC and Developers Diversified Realty Corporation (collectively, Town Center/DDR).  Town Center/DDR contracts with defendant IPC International Corp. (IPC) to provide security at the mall.  Plaintiffs Gloria Hunter and her eighteen-year-old daughter, plaintiff Jessica Hunter, are African American women who were patrons of the mall on the day in question.

## I.   The Events of February 20, 2005

On February 20, 2005, plaintiffs were shopping at The Buckle.  Jessica Hunter testified in her deposition that on the three or four occasions when she had previously

---

[1] Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

shopped at The Buckle, The Buckle's employees treated her differently from white customers.  She testified specifically that she was not greeted immediately or offered assistance without requesting it, and that she was constantly watched by the employees.  She further testified that, on the day in question, February 20, 2005, she and her mother received similar treatment, although once an employee began to assist them, they received pleasant and satisfactory service.

While plaintiffs were shopping, another African American woman, Kyone Allen, had entered the store, looked around for less than five minutes, picked up two items without trying them on, and proceeded to the checkout counter.  Plaintiffs did not know and had never met Ms. Allen.  Ms. Allen did not know the Hunters, did not make contact with them, did not walk close to them, and did not speak with them.  While in The Buckle, neither plaintiffs nor Ms. Allen did anything to suggest that the women knew each other or were together.  The Hunters did nothing suspicious while they were shopping in the store.  They did not display any of the signals that would cause a trained observer to suspect that they were working with another customer (i.e., Ms. Allen) to commit a crime.  While plaintiffs were purchasing their merchandise at the counter, they heard Jeff Schwar, an employee of The Buckle, having a dispute on the other side of the counter with Ms. Allen, who was attempting to make her purchases.  Plaintiffs overheard Mr. Schwar accuse Ms. Allen of attempting to pass a bad check and then heard him call IPC security and the Leawood police.  Ms. Allen responded with profanity, then hurried out of the store.  Meanwhile, the Hunters completed making their purchases at The Buckle by using a credit card.  When Ms. Allen left

the store, Mr. Schwar ran outside to write down the license plate number of her automobile. At the time he left the store to handle the situation with Ms. Allen, there were no indications of any problems with the plaintiffs' transaction. The Hunters left the store and began walking along the sidewalk towards The Jones Store, another retail store at the mall.

Mr. Schwar followed Ms. Allen into the parking lot and saw her enter the driver's side of a vehicle. When mall security officer Robert Garritano arrived on the scene, Mr. Schwar was standing outside The Buckle pointing to a green Ford Explorer. Mr. Schwar told Mr. Garritano that the woman in the Explorer had attempted to pay for merchandise at The Buckle with a forged check. Mr. Garritano pulled his vehicle behind Ms. Allen's vehicle. Messrs. Schwar and Garritano approached and spoke with Ms. Allen, who exited her vehicle. Mr. Schwar explained the situation to Mr. Garritano, including the fact that Ms. Allen had attempted to use a non-driver's license identification to pass the forged check. The men asked Ms. Allen why she had been sitting in the driver's seat, since she did not have a valid driver's license. She accused Mr. Schwar of having kept her license at the store (although the non-driver's license identification was later noticed on the floor of the vehicle). The men asked Ms. Allen how she had come to the mall, and she responded that others had driven her there. Around this same time, Scott Knisley from the Town Center security office arrived on the scene. He noticed a congregation of people around the green Ford Explorer, including Mr. Garritano and Ms. Allen. While Ms. Allen was being interrogated by the mall security officers and Mr. Schwar, she began looking toward the growing crowd of people who were looking at her. She noticed that the Hunters were among the people looking at her, and she

4

noticed that they were the only African Americans in the crowd.  They were standing outside the sidewalk in front of the Baja Fresh store, which is separated from The Buckle by approximately five other shops.

The crux of the predominant factual dispute in this case centers around the parties' respective views concerning what happened next.  Defendants contend that Ms. Allen led them to believe that plaintiffs were involved with her.  In support of this argument, defendants rely on the deposition testimony of Messrs. Schwar, Garritano, and Knisley. They testified that Ms. Allen told them that her "friends" had driven her to Town Center Plaza, and she then pointed to Gloria and Jessica Hunter.  At that time, the police had not yet arrived on the scene.

Plaintiffs, on the other hand, have submitted an affidavit from Ms. Allen which provides a quite different version of events.[2]  The affidavit states that as Ms. Allen was

---

[2] The City included a footnote in its reply brief in which it argues that plaintiffs should be precluded from relying on Ms. Allen's affidavit in support of their opposition to the City's motion for summary judgment because of plaintiffs' failure to timely produce Ms. Allen's contact information during the course of discovery as well as the fact that they did not produce Ms. Allen's affidavit until after the close of discovery.  The court declines to exclude this affidavit.  "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or information not so disclosed."  Fed. R. Civ. P. 37(c)(1).  Here, it appears based on Ms. Allen's affidavit that plaintiffs' failure to disclose her affidavit and contact information before the close of discovery was substantially justified. The discovery deadline in this case was March 2, 2007, and discovery was complete by that date.  Ms. Allen's affidavit states that her telephone number is unlisted and that she understood that the Hunters' attorneys had been trying to reach her for quite some time, but that she did not make herself available to give her statement until March 14, 2007.  Her affidavit was notarized the next day, on Thursday, March 15, 2007.  Plaintiffs produced the affidavit to defendants on Monday, March 19, 2007, which was the same date as the

looking at the people who were watching her, the security officers and Mr. Schwar noticed the direction in which she was looking.  Mr. Schwar began asking questions such as: "Who are you looking at?", "Is that them?", and "Are they the girls over there?"  He pointed in the direction of the Hunters and asked again, "Is that them?"  Ms. Allen responded, "No.  Are you asking me that question because they are black?"  She specifically states in her affidavit that she did not point in the direction of the Hunters or anyone else.  Mr. Knisley noticed the bag from The Buckle the Hunters were carrying and asked Mr. Schwar if it contained the merchandise from the forgery.  Mr. Schwar responded "no," stated that the Hunters paid separately, and said that he believed they had paid for their items with their own credit card.  When Ms. Allen overheard this conversation, "[she] told them that the girls who were in The Buckle were not with [her], and that [she] didn't know anything about their purchases."  According to Ms. Allen's affidavit, she never said that anyone was helping her pass forged checks, that there was more than one person who brought her to the mall, or that the person who brought her to the mall was African American.  Mr. Schwar returned to The Buckle and

---

dispositive motion deadline.  The court rejects the City's argument that plaintiffs should have produced the affidavit more promptly given the then-approaching summary judgment deadline.  Plaintiffs produced the affidavit within three working days of obtaining it, which is not an unreasonable length of time.  In light of the relatively *de minimus* record on this issue, the court finds that plaintiffs' failure to disclose was substantially justified.  Consequently, the court will not exclude the affidavit.  *See, e.g.*, *Silchia v. MCI Telecomms. Corp.*, 942 F. Supp. 1369, 1377 (D. Colo. 1996) (finding failure to disclose evidence until after the discovery deadline had passed "substantially justified" under Rule 37(c) where plaintiff had no knowledge of the evidence until after the deadline passed).

6

confirmed that he had not kept Ms. Allen's identification card and that plaintiffs had paid for their merchandise with a credit card.

When Leawood police arrived at the scene, security officer Knisley saw the plaintiffs leave the corner of Baja Fresh. This aroused suspicion in his mind, and he began following the Hunters. He followed them into The Jones Store. He went to the loss prevention room inside The Jones Store to watch them on video. He advised an employee of The Jones Store about the Hunters, and he followed them throughout The Jones Store.

Corporal Christopher Vaughn was the first police officer to arrive on the scene. Messrs. Garritano and Schwar informed him that Ms. Allen had tried to pass a bad check and that the Hunters had been in The Buckle at the same time as Ms. Allen. They informed him about Ms. Allen's identification of the Hunters. Police reports indicate that Leawood police officers were told that plaintiffs were "involved" with Ms. Allen, although Corporal Vaughn testified in his deposition that he understood that to mean only that plaintiffs were "with" Ms. Allen. The police officers subsequently learned that Ms. Allen had outstanding arrest warrants, and they discovered evidence in her vehicle that she and others had been attempting to pass forged checks. Officer Vaughn asked Ms. Allen if she was with the Hunters, the people who were being followed by the mall security officers. Ms. Allen responded that she was not with the Hunters, and that someone else brought her to the mall. Notwithstanding these statements by Ms. Allen, the police department's radio transmissions of the incident show that mall security directed the police officers to the Hunters' location in the Jones Store so that the police could "get" the Hunters and make certain they did not "ditch" any more of

the supposed forged checks.  While the Hunters were shopping in The Jones Store, Ms. Allen commented on multiple occasions to the police officers that they were the wrong people because the Hunters were not involved with her activities.  Ms. Allen also stated that the reason the Hunters were suspects was because they were black.

Two Leawood police officers decided to contact plaintiffs in The Jones Store, where they had been shopping for approximately fifteen minutes.  Gloria Hunter testified in her deposition that, while shopping in The Jones Store, she had looked at shoes and clothes for herself and also looked at jeans for Jessica Hunter.  She had picked up and looked at a pair of shoes on display, and she intended to return to the shoe department to purchase the shoes after completing shopping for her daughter.  She had not tried on the shoes or even asked whether the store had those shoes in her size (she knew that the shoes on display were not her size).  Jessica Hunter proceeded to find some jeans that she intended to try on.  Before she could do so, the two police officers confronted plaintiffs.  Officer Farris stood by Jessica Hunter while Officer Jennings stood closer to Gloria Hunter.  Jessica Hunter had picked out some jeans and was going to the dressing room to try them on when Officer Farris came up behind her and "kind of" forced her over to a counter.  He squeezed her arm, pushed her, and caused her to experience pain.  He forced her "so hard" that the jeans fell out of her hand. Officer Jennings told Gloria Hunter to come with him.  Instead of doing so, she responded by saying, "For what? . . . I'm going to see about my daughter," because she was witnessing what was transpiring with her daughter and Officer Farris. Jessica Hunter, in tears, asked her mother what she should do.  While Officer Farris was attempting to talk with Jessica Hunter,

Gloria Hunter approached in what Officer Farris viewed as a quick, aggressive move and positioned herself between him and Jessica Hunter. Officer Farris told Jessica Hunter to put her bag from The Buckle down so he could look inside, and she complied with those instructions. Gloria Hunter asked the police officer what they had done and said that she had a receipt for her purchases from The Buckle. She posed the same query on additional occasions and affirmed that she had a receipt for their purchases from The Buckle. The Hunters admitted that their protestations may have been a bit loud and that at least one of them used profanity. The police officers did not respond to their inquiries with the exception of saying that the Hunters had better "shut up" or they would be "taken to the ground." It was Officer Farris's perception that because of the tone and increased volume of Gloria Hunter's voice, he was concerned that the situation was escalating. He felt that he needed to continue his investigation of the Hunters involvement with Allen, if any. He determined that the safest way to deal with the situation was to detain the Hunters until they could resolve the issue of their involvement with Allen.

Gloria Hunter's only subsequent comment was that she was going to call her attorney. The police officers responded by saying the Hunters were being disorderly, and they told the Hunters to put their hands behind their backs to be handcuffed. Although the officers contend that plaintiffs' unruly and disruptive behavior caused them to place plaintiffs in handcuffs and that this action was unrelated to any identification of plaintiffs by Ms. Allen, plaintiffs testified in their depositions that they did nothing in The Jones Store that warranted such treatment. After the Hunters were handcuffed, they continued to proclaim their

9

innocence and asked the police officers what they had done.  A group of people in The Jones Store witnessed the Hunters being handcuffed and paraded out of the store.  Gloria Hunter suspected that their race was a factor because she was aware that Ms. Allen had done something while in The Buckle.  While plaintiffs were being handcuffed and led out of the store, they were yelling at the crowd that this was occurring to them because of racial profiling.  Police officer Kelly Ratliff observed that other customers, possibly more than twenty, watched as the Hunters were paraded to a location roughly one hundred yards from The Jones Store.  At this point in time, the Hunters appeared to be cooperating and were not struggling with the police officers.  It took the officers two to three minutes to walk the Hunters from The Jones Store to the parking lot where the police had detained Ms. Allen.

Once there, the police finally determined that the Hunters had not committed any crime by simply looking at the receipt for their purchases from The Buckle.  Even after the police determined that they had not committed any crime, a police officer told the Hunters that they had better "shut up" or their handcuffs would not be removed.  The police took the handcuffs off the Hunters approximately four to five minutes after they arrived at the parking lot.  Even after the police removed the handcuffs, the police continued to detain them for their drivers' licenses.  When the police finally allowed the Hunters to leave, Ms. Allen yelled, "I told them that y'all weren't – that y'all weren't with me."

The Hunters sustained physical injuries that required medical attention.  They also experienced emotional problems as a result of the incident, and they received psychological counseling.

**II.**     <u>Additional Evidence Relating to Plaintiffs' § 1983 Claim Against the City</u>

Each officer in the city's police department is required to know the department's policies and procedures and the department's written general orders. The city has policies and procedures prohibiting racial harassment and racial profiling. The police department also has a written general order relating to detaining and arresting persons. This order indicates that individuals may be handcuffed for officer safety, the individual's safety, the safety of others, or to control certain situations. At no point during the investigation was there probable cause to believe the Hunters had committed any crime.

Officer Ratliff testified in her deposition that of the shoplifting and forgery calls officers respond to at Town Center Plaza "probably the higher percentage" of individuals they investigate are African American. In this particular case, there was a specific reference to the fact that the Hunters were African American. She further testified that it is the policy and procedure of the Leawood police department to handcuff persons who pose a risk to themselves, to the public, or to the officer. This could involve an individual "causing a disturbance" such as "yelling and screaming, throwing arms around."

**III.**     <u>Additional Evidence Relating to the Vicarious Liability of Town Center/DDR for the Acts of IPC</u>

Security services are essential to the everyday workings at the mall. Security personnel employed by IPC provide security services at Town Center Plaza pursuant to an agreement with Town Center/DDR dated August 30, 2004. According to the agreement, IPC

is an "independent contractor" and it is to adopt its own policies. Either party may terminate the agreement upon thirty days' notice.

The agreement requires IPC to maintain its own insurance. It is responsible for direct supervision of the security personnel. Mr. Knisley is IPC's security director and primary contact with Town Center/DDR. Five to six security officers work at the mall. Town Center/DDR can determine if a particular mall security officer is acceptable and can insist that the person no longer work at the mall. Town Center/DDR pays a portion of the health insurance for security officers. The majority of duties performed by mall security occur on the mall premises. Town Center/DDR also uses mall security for jobs other than providing security services. For instance, mall security delivers all of Town Center/DDR's marketing materials, monthly newsletters, and similar information to mall tenants. Town Center/DDR approves the color and style of uniforms worn by all security officers, and each officer's uniform has an emblem that reads "Town Center Plaza Security."

The agreement between IPC and Town Center/DDR requires Town Center/DDR to supply mall security with equipment used to perform security duties at the mall. This equipment includes the following: two jeeps, one truck, and one golf cart; insurance and fuel for the vehicles; a scanner for each vehicle; several bicycles; hand-held radio transmitters; cellular telephones; a laptop computer; and a central processing unit. The vehicles driven by mall security have an emblem that reads "Town Center Plaza Security." DDR also provides mall security with a rent-free security office and the majority of its office equipment.

The agreement gives Town Center/DDR control over the following daily activities of mall security: setting the minimum number of hours worked by as well as the wages and salaries paid to Mr. Knisley and the other security officers; controlling whether security officers work overtime; requiring approval of equipment before it is carried by mall security officers; requiring that mall security equipment be in good repair; prohibiting mall security officers from carrying firearms; requiring meetings with Town Center/DDR that, in practice, occur on a daily basis; requiring compliance with a specific list of duties; requiring specific types of training; requiring instruction with Town Center/DDR's safety, security, operations, and fire prevention standards; requiring adequate staffing for patrols; requiring that incidents at the mall be reported on forms acceptable to Town Center/DDR; requiring work during the mall's hours of operation; and requiring the right to approve the regulations set forth in the handbook used by security officers.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001)

13

(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.  The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).  To accomplish this,

the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

For the reasons explained below, the court finds that a genuine issue of material fact concerning whether IPC is an agent or independent contractor precludes summary judgment on Town Center/DDR's argument that it cannot be held vicariously liable for IPC's actions. Genuine issues of material fact also exist concerning plaintiffs' claim under the full and equal benefit clause of § 1981, their § 1983 claim against the City based on an unreasonable seizure in violation of the Fourth Amendment, and their false imprisonment claim. Plaintiffs have not, however, raised genuine issues of material fact sufficient to survive summary judgment on their claim under the contracts clause of § 1981, their § 1983 claim against the City based on a violation of § 1981, or their claims for defamation and false light publicity. Summary judgment is therefore warranted on these claims.

## I.      Liability of DDR

As a threshold matter, defendant Town Center/DDR seeks summary judgment on all of plaintiffs' claims against it on the grounds that it is uncontroverted that no employee of Town Center/DDR was involved in the incident which gave rise to this litigation.[3]  Town Center/DDR contends that IPC is an independent contractor, not an agent.  "As a general rule, when a person (a contractee) lets out work to another and reserves no control over the work or workmen, the relation of contractee and independent contractor exists, and not that of master and servant, and the contractee is not liable for the negligence or improper execution of the work by the independent contractor."  *Falls v. Scott*, 249 Kan. 54, 59, 815 P.2d 1104, 1109 (1991).  The general test for distinguishing an independent contractor relationship from a principal-agent relationship is as follows:

> An independent contractor is defined as one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work.  The primary test used by the courts in determining whether the employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished.  It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor.

---

[3] DDR does not direct this argument to any particular claim.  Thus, DDR has not asked the court to distinguish between the standards for vicarious liability on plaintiffs' § 1981 claim and the standards for vicarious liability on plaintiffs' state law claims.  The court will confine its analysis accordingly and will simply address the legal argument raised by DDR, which the court finds to be without merit based on the summary judgment record.

16

*Id.* at 64, 815 P.2d at 1112.  "Although the right of control test is the most important single consideration in determining the relationship, it is not exclusive–other relevant factors are also to be considered." *McDonnell v. Music Stand, Inc.*, 20 Kan. App. 2d 287, 291, 886 P.2d 895, 899 (1994).  The factors set forth in the Restatement (Second) of Agency § 220(2) (1957) are also helpful in determining whether the court should consider an entity to be an agent for purposes of imputing fault. *Brillhart v. Scheier*, 243 Kan. 591, 597, 758 P.2d 219, 223 (1988).  These factors include:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

Restatement § 220(2).  "Where the facts are undisputed or the evidence is susceptible of only a single conclusion, it is a question of law for the court whether one is an [agent] or an independent contractor." *Falls*, 249 Kan. at 64, 815 P.2d at 1112.  Generally, however, "the question of whether an individual is an [agent] or an independent contractor is considered a question of fact for the jury or trier of facts."  *Id.*

17

In this case, plaintiffs have raised a genuine issue of material fact concerning whether IPC was an agent rather than an independent contractor. This is not a case in which the record is clear that Town Center/DDR contracted for IPC to provide security services at the mall and reserved no control over the work. Although the security agreement explicitly purports to create an independent contractor relationship, Town Center/DDR has control over many of the facets of the daily operations of mall security such as hours worked by security officers; their wages, salaries, and overtime compensation; requiring security officers to perform specific duties and receive specific types of training and instruction; dictating the use of specific forms; and reserving the right to approve the regulations set forth in IPC's handbook. IPC and Town Center/DDR have daily meetings. Town Center/DDR supplies IPC with a rent-free, on-premises security office, various security equipment, and most of IPC's office equipment. Town Center/DDR can determine if a particular mall security officer is acceptable and can insist that the person no longer work at the mall. Also, Town Center/DDR uses mall security for jobs other than providing security services such as delivery of monthly newsletters and other information to mall tenants. Town Center/DDR pays a portion of the health insurance for security officers. Either party may terminate the agreement upon thirty days' notice. Viewing this evidence in the light most favorable to plaintiffs, a rational trier of fact could conclude that Town Center/DDR exercises sufficient control over IPC to establish Town Center/DDR's vicarious liability for torts committed by IPC. Accordingly, Town Center/DDR is not entitled to summary judgment on this basis.

Summary judgment in favor of Town Center/DDR is appropriate only to the same extent warranted for the other defendants, then, as discussed below.

## II.    Section 1981 Claim Against The Buckle, Town Center/DDR, and IPC

Plaintiffs allege that they were subjected to racial discrimination at the hands of defendants, in violation of 42 U.S.C. § 1981, when they were handcuffed without cause in The Jones Store and paraded through the parking lot before eventually being released.  To establish a prima facie case of discrimination under § 1981, plaintiffs must show (1) that they are members of a protected class; (2) that defendants had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981.  *Barfield v. Commerce Bank, N.A.*, Case No. 06-3087, 2007 WL 1252483, at *1 (10th Cir. May 1, 2007) (publication forthcoming).  As it is undisputed that plaintiffs are African American, the court must consider whether the summary judgment record presents a genuine issue of material fact about whether defendants intentionally discriminated against plaintiffs on the basis of their race, as well as whether that discrimination interfered with a protected activity.

### A.    Intent to Discriminate

The Tenth Circuit has explained that the "essential legal requirement of *intent* to *discriminate*" for purposes of § 1981 invokes two interlinked principles.  *Roe ex rel. Roe v. Keady*, 329 F.3d 1188, 1191 (10th Cir. 2003) (emphasis in original).  The first principle is the requirement of intentional conduct.  *Id.*  Second is the requirement that the conduct must

19

be "imbued with or directed toward an impermissible *discriminatory* purpose, which implies more than intent as volition or intent as awareness of consequences," and instead "implies that a decisionmaker singled out [the plaintiff] for disparate treatment and selected [t]his course of action at least in part *for the purpose of causing its adverse effects*." *Id.* at 1192 (emphasis and alterations in original) (quotations omitted). Ultimately, a plaintiff must show that race was a motivating factor in the defendant's decision to discriminate. *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1107, 1112 (10th Cir. 2001) (ultimate issue is whether adverse action was motivated by race; approving "motivating factor" jury instruction); *see also Kelly v. Bank Midwest, N.A.*, 177 F. Supp. 2d 1190, 1204 (D. Kan. 2001).

At this procedural juncture, the court must of course view the evidence in the light most favorable to plaintiffs, the non-moving parties. Viewed as such, the court must accept as true Ms. Allen's affidavit, in which she states that she did not point to or identify plaintiffs as her companions. In fact, according to Ms. Allen, she expressly denied the suggestion that plaintiffs were with her and accused Mr. Schwar and the security officers of singling out plaintiffs because of their race. Additionally, it is undisputed that plaintiffs were the only African Americans among the crowd of people who were observing the scene with Ms. Allen. Although plaintiffs carried a shopping bag from The Buckle, Mr. Schwar had informed the security officers of his belief that the bag did not contain items purchased with the bad check and that plaintiff had properly paid for their items with a credit card. Defendants had no basis to believe that plaintiffs knew or were involved with Ms. Allen in

any way other than Ms. Allen's alleged identification of plaintiffs, which must be assumed not to have occurred. These facts provide evidence from which a jury could reasonably believe that defendants picked plaintiffs out of the crowd as Ms. Allen's likely companions and possible accomplices because they were the same race as Ms. Allen.

Moreover, because the court must assume that Ms. Allen did not, in fact, identify plaintiffs in any way, the court must also conclude that a jury could reasonably find defendants' stated reasons for their actions—Ms. Allen's identification of plaintiffs—to be pretextual. *See Hampton*, 247 F.3d at 1170-08 (*McDonnell Douglas* framework applies in cases of indirect evidence of discrimination under section 1981; concluding that evidence of pretext supported jury finding of discrimination). "'[R]ejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.'" *Id.* at 1108 (emphasis in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). The evidence of pretext provides evidence of discriminatory intent here.

Finally, plaintiffs have provided evidence that employees of The Buckle treated African Americans differently in the store. "[E]vidence of discriminatory surveillance, although on its own not actionable under section 1981, can certainly be viewed as indirect evidence of discrimination." *Id.* at 1108-09 (citations omitted). Accordingly, Jessica Hunter's testimony that she has been treated differently and watched more closely than white customers in The Buckle, though based only on her subjective belief formed in limited

experience in the store, nevertheless provides additional evidence from which a jury could infer discriminatory intent.

Drawing all inferences in plaintiffs' favor, then, the court concludes that a rational trier of fact could find that plaintiffs' race was a motivating factor in defendants' decision to identify plaintiffs for police as persons somehow involved with Ms. Allen.

B.   Interference with a Protected Activity

Defendants also challenge plaintiffs' ability to show that the discrimination interfered with a protected activity as defined in § 1981, as required to satisfy the third element of plaintiffs' prima facie case. Plaintiffs allege that defendants' discrimination interfered with their right to make a contract and to their right to the full and equal benefit of the laws, both of which are protected interests. *See Bolden v. City of Topeka*, 441 F.3d 1129, 1134 (10th Cir. 2006) (quoting § 1981(a)).

1.   *Contracts Clause*

Plaintiffs allege that defendants' discrimination interfered with their right to purchase items at The Jones Store. Defendants have objected to the inclusion in the pretrial order of a claim based on the contracts clause of § 1981. This objection is based on the fact that plaintiffs' complaint specifically referenced the "full and equal benefit" clause in the count alleging a violation of § 1981, but did not include a similar reference to the contracts clause. Defendants' objection is overruled. Plaintiffs' complaint included an allegation that the police officers "interrupted Plaintiffs' attempts to enter into contracts of purchase" from The Jones Store. Fourth Am. Compl. (doc. #114), ¶ 19. The court finds this adequate to have

22

given defendants notice of the claim under the contracts clause. To the extent that this allegation may have been insufficient to set out a claim based on the contracts clause, the court would still overrule the objection. Plaintiffs' attempt to add a new claim in the pretrial order is evaluated by the court under the standards set forth in Rule 15(a) of the Federal Rules of Civil Procedure. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). As such, leave to amend "'shall be freely given when justice so requires.'" *Id.* (quoting Fed. R. Civ. P. 15(a)). The most important factor in deciding a motion to amend the pleadings is whether the amendment would prejudice the moving party. *Id.* at 1207-08. Prejudice generally refers to an amendment which unfairly affects the defendants in terms of preparing their defense to the amendment. *Id.* Here, defendants deposed plaintiffs about their ability to complete their purchases in The Jones Store and defendants have addressed the contract clause in the § 1981 section of their briefs. Consequently, defendants will suffer no prejudice if plaintiffs are permitted to rely on the contract clause for their § 1981 claim.

Section 1981 protects the right "to make and enforce contracts." *Barfield*, 2007 WL 1252483, at *1 (quoting 42 U.S.C. § 1981(a)). The term "make and enforce contracts" is statutorily defined as including "'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Id.* (quoting § 1981(b)). The statute encompasses all phases and incidents of the contractual relationship. *Id.* (quoting *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994)). Thus, "§ 1981 protects enjoyment of the benefits of a contract from

*any* impairment, so long as the impairment arises from intentional discrimination." *Hampton*, 247 F.3d at 1106 (emphasis in original).

Here, the non-police officer defendants argue that they did not cause plaintiffs' detention by police officers. They contend that they merely gave information to the officers, who subsequently acted on the basis of their own investigation and judgment. "Relief is available under § 1981 where a party discriminatorily uses its authority to preclude an individual from securing a contract with a third party." *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1197 (10th Cir. 2002). This requires the plaintiff to show "that the party both possessed sufficient authority to significantly interfere with the individual's ability to obtain contracts with third parties, and that the party actually exercised that authority to the individual's detriment." *Id.* Viewing the evidence in the light most favorable to plaintiffs, the summary judgment record reflects that plaintiffs did nothing to warrant their detention and handcuffing by police in The Jones Store, which in turn suggests that the police officers were acting solely in reliance on the non-police officer defendants' identification of plaintiffs as Ms. Allen's companions. The non-police officer defendants also argue that they did not indicate to the police officers that they suspected or believed that plaintiffs had committed any crime. There is evidence, however, that they told the police officers that plaintiffs were "involved" with Ms. Allen, and that they did not initially inform the officers that plaintiffs had properly paid for the items in their shopping bag. Thus, there is sufficient evidence to create an issue of fact concerning whether these defendants actually had the ability and used

that ability to cause the detention of plaintiff, thereby significantly interfering with plaintiffs' right to purchase items at The Jones Store.

Defendants also argue they did not cause any interference with plaintiffs' contract rights because plaintiffs had not yet attempted to purchase anything from The Jones Store at the time of their detention. "'[A] § 1981 claim for interference with the right to make and enforce a contract must involve the actual loss of a contract interest, not merely the possible loss of future contract opportunities.'" *Hampton*, 247 F.3d at 1104 (quoting *Wesley v. Don Stein Buick, Inc.*, 42 F. Supp. 2d 1192, 1200 (D. Kan. 1999)); *see also Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989) (mere allegation of possible loss of future contract opportunities did not state a deprivation of the right to make and enforce contracts protected by § 1981). In the context of a retail transaction, a plaintiff must demonstrate that he or she was actually prevented from making a purchase or that he or she would have attempted to make a purchase but for the interference. *See Wesley*, 42 F. Supp. 2d at 1201.

Here, Jessica Hunter had selected jeans to try on, but there is no evidence that she had decided to purchase any particular jeans by the time that plaintiffs were detained. Gloria Hunter testified that she intended to return to the shoe department and purchase a particular style of shoes after completing shopping for her daughter. She conceded, however, that she had not tried on any shoes or even asked whether the store had those shoes in her size. The Tenth Circuit was confronted with similar facts in *Shawl v. Dillard's Inc.*, 17 Fed. Appx. 908,

25

2001 WL 967887 (10th Cir. Aug. 27, 2001) (unpublished table opinion).[4]  In that case, plaintiff Shawl tried on two pairs of shoes, brought the shoes to the counter with the specific intent to buy them, but decided to put them on hold until the next day so that a rude salesperson would not receive a commission on the sale.  When Shawl was told that sale items could not be put on hold, she left the store without making the purchase.  *Id.* at 912. The Tenth Circuit rejected the argument that this conduct could form the basis for a claim under the contracts clause of § 1981, reasoning that when Shawl left the store there were no guarantees that the shoes would be there the next day or that she would return to purchase them the next day.  *Id.*  She had not shown an actual contract loss because "she opted not to pursue the contract."  *Id.*

The facts of this case involve so-called attempted purchases that are even more attenuated from the point of contract formation than the shoes at issue in *Shawl*.  Although Gloria Hunter testified that she intended to return to the shoe department the same day, she had not even tried on any shoes or determined whether the particular shoes were available in her size.  As in *Shawl*, there was no guarantee that she would actually return and purchase the shoes or that her size shoe would be available.  Also as in *Shawl*, she is relying on her unexpressed subjective intent to return and purchase a pair of shoes that might not be there. Similarly, Jessica Hunter had merely selected a pair of jeans to try on.  When the police officers intervened, this caused, at most, the mere possible loss of a future contract

---

[4] The court is citing this case for its persuasive value on a material issue in the case.

opportunity, not the actual loss of a contract interest.  Plaintiffs had not yet opted to pursue

a contract.  As such, even viewing the facts in the light most favorable to them, their asserted

inability to purchase those goods cannot form the basis for a claim under the contracts clause

of § 1981 because they have not shown that defendants' discrimination interfered with their

right to make a contract.  Summary judgment is therefore awarded on this claim.

>           2.      *Full and Equal Benefits Clause*

Plaintiffs also allege liability under § 1981's protection of their right "to the full and

equal benefit of all laws and proceedings for the security of persons and property."   §

1981(a).  Plaintiffs base their claim in this case on their detention and handcuffing by police

in The Jones Store.  Certainly, such a claim is actionable.  *See Lewis v. Commerce Bank &*

*Trust*, 333 F. Supp. 2d 1019, 1021 (D. Kan. 2004) (observing that § 1981 cases that are

allowed to proceed on a claimed violation of the equal benefit clause "allege detentions or

arrests or searches by police or security personnel"; collecting cases).

The non-police officer defendants argue that plaintiffs cannot establish the requisite

causation between their actions and the actions of the police officers in The Jones Store.

They insist that they merely gave information to police officers who made the ultimate

decision to detain plaintiffs.  They contend that plaintiffs must show that their conduct

proximately caused the detention by the police.  Defendants, however, have offered no

support for a proximate cause requirement in this context, and the court declines to read such

a requirement into the statute.  Under the contracts clause of § 1981, "the proper focus is on

whether the defendant had the intent to discriminate on the basis of race, and whether that

discrimination interfered with the making or enforcing of a contract." *Hampton*, 247 F.3d at 1106-07.  Thus, the only causation requirement in that context appears to be direct, "but-for" causation.  As noted above, the Tenth Circuit limited liability for third-party claims under § 1981, but that analysis involved the contracts clause, not the equal benefit clause of § 1981.  Moreover, § 1981 explicitly applies to non-governmental actors, *see* § 1981(c), which indicates that a private party may violate the equal benefit clause by causing the arrest or detention at issue.  *See Hester v. Wal-Mart Stores, Inc.*, 356 F. Supp. 2d 1195, 1200 (D. Kan. 2005) (concluding that state action is not required to state an equal benefit claim under § 1981).  The court has already concluded that the evidence was sufficient to create a jury question concerning whether defendants' discriminatory conduct caused plaintiffs' detention under the third-party standard set forth by the Tenth Circuit in *Harris*.  That same evidence is sufficient to satisfy the causation requirement for plaintiffs' equal benefit claim for purposes of summary judgment.  Accordingly, summary judgment is denied on that claim.

III.    **§ 1983 Claim Against The City**

Municipalities may not be subjected to respondeat superior liability under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Norton v. City of Marietta*, 432 F.3d 1145, 1155 (10th Cir. 2005).  A municipality can be liable under § 1983 if the plaintiff shows "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).  An

unconstitutional deprivation is caused by a municipal "policy" if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself. *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003). A "custom" means an act that, although not formally approved by the appropriate decision maker, has such widespread practice as to have the force of law. *Id.* The challenged policy or custom need not be formal or written. *Camfield v. City of Okla. City*, 248 F.3d 1214, 1229 (10th Cir. 2001). Plaintiffs' § 1983 claim against the City is essentially premised on two different alleged constitutional violations: (1) a § 1981 racial discrimination claim, and (2) an unreasonable seizure in violation of the Fourth Amendment for the officers' handcuffing of plaintiffs.

> A.   § 1981 Racial Discrimination Claim

Section 1983 is the sole means for a plaintiff to pursue a § 1981 claim against a municipality. *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006); *see Dockery v. Unified Sch. Dist. No. 231*, 382 F. Supp. 2d 1234, 1240 (D. Kan. 2005). Consequently, although the court has found that plaintiffs' § 1981 claim survives summary judgment against the other defendants insofar as it is based on the full and equal benefit clause, in order for that claim to survive summary judgment against the City plaintiffs must produce evidence that a municipal policy or custom was the moving force behind the police officers' alleged racial discrimination. Plaintiffs have not raised a genuine issue of material fact that any such policy or custom exists. Defendants have submitted evidence that the police department has an official policy prohibiting racial harassment and racial profiling. Plaintiffs have not

29

pointed to any evidence to the contrary. In support of this claim they seem to be relying on Officer Ratliff's deposition testimony that with respect to the race of individuals who are investigated for shoplifting and forgery at Town Center Plaza "probably the higher percentage is African-American" and that during the incident on the day in question there was a specific reference to the fact that the Hunters were African American. The court has carefully reviewed the cited deposition testimony of Officer Ratliff and concludes that no rational trier of fact could infer based on her testimony that an official policy or custom of racial discrimination existed, let alone that the officers acted pursuant to any such policy on the day in question. Instead, her testimony reflects nothing more than observations of fact concerning investigations for shoplifting and forgery at Town Center Plaza, including the incident that is the subject of this lawsuit. Accordingly, the City's motion for summary judgment is granted on this aspect of plaintiffs' § 1983 claim.

 B. <u>Fourth Amendment Violation</u>

 "The Fourth Amendment protects citizens from unreasonable searches and seizures by government actors." *United States v. Sanchez*, 89 F.3d 715, 717 (10th Cir. 1996). A seizure occurs when a police officer, by means of physical force or show of authority, in some way restrains a citizen's liberty. *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). In this case, plaintiffs were physically restrained and forcibly detained when they were placed in handcuffs. No reasonable person would have believed that he or she was free to leave upon being placed in handcuffs. *Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005) (Fourth Amendment seizure occurs when a reasonable person would believe that he or she

is not free to leave); *see, e.g.*, *Buxton v. Nolte*, 473 F. Supp. 2d 802, 810 (S.D. Ohio 2007) ("A reasonable person would believe that he was not free to leave upon being handcuffed."). Thus, plaintiffs were seized within the meaning of the Fourth Amendment when the officers placed them in handcuffs. The more pivotal issue here is whether the seizure was "unreasonable" under the Fourth Amendment.

The City seeks to justify the police officers' handcuffing of the plaintiffs as part of an investigative detention. Even if the court were to assume that the officers had reasonable suspicion to detain plaintiffs in The Jones Store as part of their investigation concerning their reported involvement with Ms. Allen's forgery at The Buckle, the officers' detention of plaintiffs must have been "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968); *accord United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc). As such, the officers were permitted to ask plaintiffs questions in order to dispel or confirm their suspicions about their involvement with Ms. Allen. It is well settled, however, that plaintiffs were "not obliged to respond." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (detainee must be released unless the detainee's answers provide the officer with probable cause to arrest him or her); *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993). Thus, to the extent that the officers placed plaintiffs in handcuffs in an effort to force them to cooperate in the investigation, the officers' actions exceeded the permissible scope of the initial stop because there was no legitimate investigatory justification for the handcuffing.

The City also contends that plaintiffs were loud and unruly. Although law enforcement officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo during a *Terry* stop, the use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when the circumstances reasonably warrant such measures. *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998). The use of handcuffs is appropriate only as long as there is a reasonable, articulable ground for fearing danger from the suspects. *United States v. Neff*, 300 F.3d 1217, 1221 (10th Cir. 2002). In this case, there is no evidence from which a rational trier of fact could find that plaintiffs created any meaningful concerns to the safety of the officers or anyone around them that warranted the use of handcuffs. The officers had no reason to believe that they were armed or dangerous. Plaintiffs are both females, and Jessica Hunter was only eighteen years old at the time. They were shopping in a public location in an upscale[5] mall. Absent legitimate safety concerns or any other extenuating circumstances, the use of a forceful technique such as handcuffs "exceed[ed] the scope of the investigative detention and enter[ed] the realm of an arrest." *Cortez v. McCauley*, 478 F.3d 1108, 1115-16 (10th Cir. 2007) (en banc). It is uncontroverted that the police officers did not have probable cause to arrest plaintiffs. Viewing the facts in the light most favorable to plaintiffs, then, a genuine issue of material fact exists concerning whether the officers' handcuffing of plaintiffs exceeded the legitimate bounds of a *Terry* stop and constituted an unreasonable

---

[5] The court takes judicial notice of this fact.

seizure in violation of the Fourth Amendment.  *See Stuart v. Jackson*, 24 Fed. Appx. 943, 950 (10th Cir. 2001)[6] (unpublished table opinion) (whether handcuffing constituted unreasonable seizure in violation of the Fourth Amendment was a jury question in a § 1983 action).

Of course, because of the standards for municipal liability on a § 1983 claim, plaintiffs must also show that a municipal policy or custom was the moving force behind this constitutional violation.  Again, the summary judgment record reflects that a genuine issue of material fact exists on this issue.  Officer Ratliff testified in her deposition about the department's policies and procedures relating to handcuffing individuals.  She testified that the Leawood police officers can handcuff people for safety reasons or "to control the situation."  She testified that "control[ling] the situation" could range from a suicidal subject to "people who are causing a disturbance."  She further elaborated that "causing a disturbance" would refer to circumstances in which people are

> yelling and screaming, throwing arms around; if it's in a crowded area, *if we need to remove them from the situation to calm everything down and they are not willing to go with us*; to get out – to get out of a situation where it could be uncontrollable in an area where other people could be injured or things could be damaged, then we will cuff – *we will handcuff people, if they are uncooperative, to remove them from a situation*.

Ratliff Dep. at 19:3-12 (emphasis added).  A rational trier of fact could conclude from this testimony that the Leawood police department has a custom (i.e., a widespread practice) of

---

[6] This unpublished case is being cited for its persuasive value on a material issue in this case.

allowing its officers to handcuff people just to calm them down or because they are being uncooperative.  The court has already explained that these are insufficient justifications for such intrusive measure as handcuffs.  Based on the nature of the officers' actions in this case, a rational trier of fact could also conclude that this custom was the moving force behind the officers' actions on the day in question.  Accordingly, the City is not entitled to summary judgment on this aspect of plaintiffs' § 1983 claim.


**IV.    False Imprisonment Claim[7]**

Under Kansas law, a plaintiff seeking to recover for false imprisonment must prove that he or she was "unlawfully caused to be arrested" by the defendant.  *Thompson v. Gen. Fin. Co.*, 205 Kan. 76, 87-88, 468 P.2d 269, 280 (1970).  "[T]hough it is not necessary that the arrest was directly ordered" by the defendant, "it must appear that [the defendant] either instigated it, assisted in the arrest, or by some means directed, countenanced or encouraged it."  *Id.*  It is not necessary that the defendant expressly direct the arrest or even be present when the arrest is actually made.  *Thurman v. Cundiff*, 2 Kan. App. 2d 406, 407, 580 P.2d 893, 897 (1978).  The defendant must, however, have taken some active part in bringing about the arrest in the sense of having engaged in an affirmative act which induces the officer

---

[7] In the pretrial order, plaintiffs purport to assert their state law claims against all defendants.  *See* Pretrial Order (doc. #143), ¶ 6(a), at 12.  But, the court has already dismissed plaintiffs' state law claims against defendant IPC based on the statute of limitations.  *See Hunter v. The Buckle, Inc.*, Case No. 06-2056-JWL, 2006 WL 3359641, at *2-*3 (D. Kan. Nov. 20, 2006).  Thus, these claims remain in the case only as to the other defendants—The Buckle, Town Center/DDR, and the City.

to make the arrest. *Id.*; *see also Kelly v. Bank Midwest, N.A.*, 161 F. Supp. 2d 1248, 1258 (D. Kan. 2001) (stating and applying these standards).

Defendants Town Center/DDR and The Buckle contend that they merely gave information to the police officers, and that therefore they did not commit any affirmative act to induce plaintiffs' detention by the police officers. They rely on *Kelly*, a case in which this court granted summary judgment in favor of a bank whose employees did nothing more than call the police to report the presence of suspicious characters in the parking lot. 161 F. Supp. 2d at 1258. In this case, however, the non-police officer defendants' conduct went beyond that of the bank in *Kelly*. They did not merely tell police that plaintiffs had raised suspicions. Instead, the evidence, viewed in plaintiffs' favor, shows that they misrepresented to police that a forger had identified plaintiffs as her companions, telling police that plaintiffs were "involved" with the forger, despite the knowledge that plaintiffs had properly paid for their items at The Buckle and the lack of any independent basis for suspecting plaintiffs of any wrongdoing. Further, plaintiffs' testimony that they did nothing in The Jones Store to warrant their detention and handcuffing provides evidence that the police officers acted solely in reliance on the other defendants' statements. Based on these facts, the Kansas Supreme Court's decision in *Thompson* is far more apposite. In that case, in upholding a verdict for the plaintiff on his false imprisonment claim, the court noted the evidence that the defendants had "instigated, assisted and countenanced [the plaintiff's] arrest by not making a full and truthful disclosure of the facts to the county attorney," including the signing of a false affidavit. *Thompson*, 205 Kan. at 88, 468 P.2d at 280. Similarly, in this case, accepting

35

the evidence submitted by plaintiffs as true, defendants gave false information to police officers who detained plaintiffs in reliance on that information.  Accordingly, under *Thompson*, the court cannot say that defendants did not take an active part in the detention of plaintiffs as a matter of law.  Accordingly, Town Center/DDR and The Buckle's motions for summary judgment on this claim are denied.

The City contends that the police officers acted reasonably in detaining plaintiffs for a matter of minutes in order to conclude their investigation of their involvement, if any, with Ms. Allen.  This argument might have some merit if the court were to view the facts in the light most favorable to the police officers.  Again, however, the court must view the evidence in the light most favorable to plaintiffs.  Viewed as such, Ms. Allen repeatedly made statements to the police officers to the effect that the Hunters were not with her, that they had no involvement in the incident with the bad check, and that the only reason mall security was targeting them was because of their race.  The officers nonetheless went to The Jones Store to find plaintiffs, and Officer Farris grabbed Jessica Hunter's arm so hard that he caused her to drop the jeans she was carrying and forced her over to the sales counter.  Gloria Hunter told the officers that she had a receipt for their purchases from The Buckle.  Although the Hunters may have been being loud and accusing the officers of racial profiling, from plaintiffs' perspective this appeared to have been a fair accusation.  The officers could have dispelled the entire situation without handcuffing the Hunters if they had just let Gloria Hunter show them her receipt from the Hunter's purchases from The Buckle.  The fact that the officers placed the Hunters in handcuffs only after Gloria Hunter threatened to involve

her attorney makes it seem more like they did so as a show of authority because they were perturbed, thus undercutting the officers' purported justification that the Hunters were placed in handcuffs because they were being disorderly, particularly when the incident could have ended if the officers would have just looked at the Hunters receipt from their purchases from The Buckle before placing them in handcuffs and parading them out of the store. Additionally, the officers admit that at no time did they have probable cause to believe that plaintiffs had committed a crime. Based on this evidence, a rational trier of fact could conclude that the officers' purported justification for the handcuffing (i.e., plaintiffs being loud and unruly) was false and was an after-the-fact justification to cover up their unlawful arrest. Accordingly, the City's motion for summary judgment on this claim is denied, as well.

## V.    Defamation Claim

Plaintiffs allege that defendants are liable for defamation under Kansas law based on their communicating to police officers that plaintiffs had been involved in a crime. "The elements of defamation include false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed." *Hall v. Kan. Farm Bureau*, 274 Kan. 263, 276, 50 P.3d 495, 504 (2002). Defendants argue that summary judgment is warranted because plaintiffs have not submitted any evidence that their reputations have been harmed. In response to this argument, plaintiffs assert that the defendants' accusations constituted "per se" defamation. The Kansas Supreme Court, however, has abolished the

37

previous rule that damages are presumed in defamation "per se" cases. *Gobin v. Globe Pub. Co.*, 232 Kan. 1, 5, 649 P.2d 1239, 1242 (1982); *see also Polson v. Davis*, 895 F.2d 705, 708 (10th Cir. 1990) (recognizing this change). "'[D]amage to one's reputation is the essence and gravamen of an action for defamation.'" *Lamb v. Rizzo*, 391 F.3d 1133, 1138 (10th Cir. 2004) (quoting *Gobin*, 232 Kan. at 6, 649 P.2d at 1243).

In plaintiffs' sworn answers to interrogatories, they conceded that they "know of no person at this time who can state that their reputation was damaged." In opposition to defendants' motions for summary judgment, they contend that (1) although no one has stepped forward as of this date to state that they believe the Hunters are criminals, it is likely that out of the hundreds of people who witnessed the incident someone certainly has that belief, and (2) proof of actual damage to their reputations arises from the fact that they sought psychological counseling immediately after the incident. These assertions, however, are not sufficient to preclude summary judgment. Proof of damages to reputation typically entails showing that persons were deterred from associating with the plaintiff, that the plaintiff's reputation has been lowered in the community, or that the plaintiff's profession suffered. *See Colboch v. Morris Commc'ns Co.*, Case No. 05-4143-SAC, 2007 WL 315804, at *16 (D. Kan. Jan. 31, 2007); *Carraway v. Cracker Barrel Old Country Store, Inc.*, Case No. 02-2237-KHV, 2003 WL 21685909, at *12 (D. Kan. July 16, 2003). Injury to plaintiff's own sensibilities is not enough to support a defamation claim. *St. Catherine Hosp. v. Rodriquez*, 25 Kan. App. 2d 763, 768, 971 P.2d 754, 758 (1998). Plaintiffs have offered no such evidence relating to their reputation. Their speculation (without evidence) that someone in

the crowd must have believed them to be criminals after witnessing their detention is immaterial without evidence that the bystander had any personal knowledge of plaintiffs' reputations. Nor does the fact that plaintiffs may have suffered emotional injury from the incident bear on the existence of harm specifically to their reputations. *See Gobin*, 232 Kan. at 7, 649 P.2d at 1244 (holding a plaintiff "cannot recover in a defamation action for mental anguish in the absence of proof of the principal injury with which a defamation action is concerned—injury to reputation").

Because plaintiffs have not presented evidence sufficient to create a genuine issue of material fact that their reputations were damaged by the incident, then, defendants' motions for summary judgment are granted on this claim. *See, e.g.*, *Pfannenstiel v. Osborne Publishing Co.*, 939 F. Supp. 1497, 1502 (D. Kan. 1996) (granting summary judgment on the plaintiff's defamation claim in the absence of evidence of damage to reputation); *Hall*, 274 Kan. at 276-77, 50 P.3d at 504-05 (summary judgment appropriate in the absence of evidence of damage to reputation).[8]

## VI. **False Light Publicity Claim Against All Defendants**

In plaintiffs' final claim, they assert that defendants are liable under Kansas law for portraying them in a false light by publicizing that they had committed or assisted in a crime

---

[8] In view of this ruling, the court declines to address defendants' arguments that they did not make any defamatory statements and that their statements to police were protected by a qualified privilege.

and by holding them out in public view in handcuffs and in custody.  "'One who gives to another publicity which places him [or her] before the public in a false light of a kind highly offensive to a reasonable [person], is subject to liability to the other for invasion of his [or her] privacy.'"  *Rinsley v. Frydman*, 221 Kan. 297, 303, 559 P.2d 334, 339 (1977) (quoting the then-draft version of the Restatement (Second) of Torts § 652E.  The term "publicity" in this context "'means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'"  *Dominquez v. Davidson*, 266 Kan. 926, 937, 974 P.2d 112, 121 (1999) (quoting *Ali v. Douglas Cable Commc'ns*, 929 F. Supp. 1362, 1383 (D. Kan. 1996)).  One of the comments to the Restatement explains this "publicity" element:

> "Publicity" . . . differs from "publication," as that term is used . . . in connection with liability for defamation.  "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means.  It is one of a communication that reaches, or is sure to reach, the public.
>
> Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.  On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term . . . .  The distinction, in other words, is one between private and public communication.

Restatement (Second) of Torts § 652D cmt. a (1977); *see also Dominguez*, 266 Kan. at 937, 974 P.2d at 121 (quoting a portion of this comment from *Ali*, 929 F. Supp. at 1383).

The non-police officer defendants' conduct in making statements to police officers concerning plaintiffs does not constitute publicizing for purposes of this tort. There is no evidence that they communicated anything concerning plaintiffs to a large group of people. At most, they informed a select group of police officers on the scene that they believed plaintiffs were involved with the forged check incident involving Ms. Allen. *See, e.g.*, *Dominguez*, 266 Kan. at 937, 974 P.2d at 121 (statements made by an employer to a select group of managerial employees did not constitute publicity sufficient to support a false light claim). Plaintiffs contend that the police officers publicized the false portrayal of them as criminals when they handcuffed them in front of other customers in The Jones Store and paraded them to the police car through a crowded parking lot. Plaintiffs, however, have not offered any authority or rationale for imputing that conduct by the officers to the non-police officer defendants for purposes of supporting a false light claim. Consequently, plaintiffs have not raised a genuine issue of material fact that the non-police officer defendants engaged in the requisite publicity. Accordingly, the motions for summary judgment of defendants Town Center/DDR and The Buckle are granted on plaintiffs' false light publicity claim.

The City argues that it is entitled to summary judgment on this claim because plaintiffs have failed to establish that the police officers publicized false statements to a third party. The court agrees. The only evidence in the record concerning the number of customers who saw the Hunters handcuffed and "paraded" out of The Jones Store to a location roughly one hundred yards away is that "possibly" more then twenty people saw this

41

incident.  This does not constitute such widespread communication that the matter must be regarded as substantially certain to become one of public knowledge.  The officers did not publish the matter in a newspaper or magazine, broadcast it over the radio, or post it in a shop window indefinitely.  *See* Restatement § 652D cmt. a & illus. 2 (stating that these types of advertisements would constitute "publicity").  Rather, the "parading" is more akin to a statement, in which case it must be "made in an address to a large audience" in order to constitute publicity.  *See id.* cmt. a.  Here, it was only communicated to a small group of persons.  *Id.* (noting that "it is not an invasion of the right of privacy . . . to communicate a fact . . . to a small group of persons"); *cf. Polin v. Dun & Bradstreet, Inc.*, 768 F.2d 1204, 1206-07 (10th Cir. 1985) (no publicity under the principles stated in Restatement § 652D where credit reports were sent to a total of seventeen subscribers).  Accordingly, the City is also entitled to summary judgment on this claim.[9]


**IT IS THEREFORE ORDERED BY THE COURT** that defendants' motions for summary judgment are granted in part and denied in part as follows:

1.)   the motions for summary judgment of defendants The Buckle and Town Center/DDR (docs. #112 & #139) are granted on plaintiffs' claim under the contracts clause of § 1981, as well as plaintiffs' defamation and false light claims; they are denied with

---

[9] Again, in view of this ruling, the court declines to address defendants' other arguments concerning plaintiffs' false light invasion of privacy claim.

respect to plaintiffs' claim under the full and equal benefits clause of § 1981, as well as plaintiffs' false imprisonment claim;

2.) the City's motion for summary judgment (doc. #135) is granted on plaintiffs' § 1983 claim based on a violation of § 1981 and it is denied on plaintiffs' § 1983 claim based on an unreasonable seizure in violation of the Fourth Amendment; it is granted in part and denied in part on plaintiffs' state law claims to the same extent as the motions of The Buckle and Town Center/DDR; and

3.) IPC's motion for summary judgment (docs. #137 & #138) is granted in part and denied in part on plaintiffs' § 1981 claim to the same extent as the motions of The Buckle and Town Center/DDR.

**IT IS SO ORDERED** this 29th day of May, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

43